**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**CHRISTINE P.**

                      **Plaintiff,**

**v.**                                           **6:20-CV-00702 (NAM)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

                      **Defendant.**

_____

**Appearances:**

Justin M. Goldstein
Law Offices of Kenneth Hiller, PLLC
6000 North Bailey Avenue, Suite 1A
Amherst, NY 14226
_Attorney for the Plaintiff_

Candace Lawrence
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, MA 02203
_Attorney for the Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

    Plaintiff Christine P. filed this action on June 22, 2020 under 42 U.S.C. § 405(g),

challenging the denial of her application for social security disability ("SSD") benefits under the

Social Security Act.  (Dkt. No. 1).  The parties' briefs are now before the Court.  (Dkt. Nos. 12,

15).  After carefully reviewing the administrative record, ("R," Dkt. No. 8), the Court reverses the decision of the Commissioner and remands for further proceedings.

## II.    BACKGROUND

### A.  Procedural History

Plaintiff applied for SSD benefits on July 19, 2017, alleging disability as of October 5, 2016.  (R. 89).  Plaintiff's initial claim was denied, and a hearing was held on April 3, 2019 before Administrative Law Judge ("ALJ") David Romeo.  (R. 46–75).  On April 25, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the relevant time period.  (R. 15–38).  Plaintiff's subsequent request for review by the Appeals Council was denied.  (R. 6–9).  Plaintiff then commenced this action.  (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was born in 1970 and was 46 years old as of the alleged onset date of disability.  (R. 214).  She has a high school education and work history as a certified nurse's assistant and food service worker.  (R. 164–74, 202–13, 218).  She claimed to be unable to work due to the following conditions: 1) right distal ulnar fracture status post open reduction and internal fixation ("ORIF"); 2) complex regional pain syndrome ("CRPS"); 3) anxiety disorder; and 4) depressive disorder.  (R. 213, 217, 220–24, 226, 228–39).

Plaintiff testified that she broke her wrist at work in 2016, an injury for which she received Worker's Compensation ("WC").  (R. 56).  As of the hearing in April 3, 2019, Plaintiff worked part-time as a bus monitor.  (R. 51).  Plaintiff testified that her impairments prevent her from working full-time due to the "lack of range of motion" in her dominant right hand and the "inability to lift and grasp with the hand."  (R. 57–58).  Plaintiff also testified that she suffers from anxiety and depression.  (R. 60).

### C.  Medical Evidence

Plaintiff has received treatment from a multitude of providers, and the Court will briefly summarize her treatment records in chronological order.  Then the Court will do the same for the medical opinions of her providers, as well as those offered in connection with her WC claim and her SSD application.

### 1.  Treatment Records

On October 5, 2016, Plaintiff went to the emergency room after she tripped at work and fell onto her outstretched right arm.  (R. 384–95, 524–27).  X-rays of the right wrist showed a comminuted displaced distal radius fracture with intraarticular component and ulnar styloid fracture.  (R. 386, 389).  On October 10, 2016, orthopedic surgeon Stephen Adcock, M.D. performed ORIF surgery on her right wrist.  (R. 382, 520–23).  From November 2, 2016 to February 14, 2017, Plaintiff received occupational therapy on her wrist.  (R. 293–369, 375–79, 517–19, 543–44, 718–34).  She always wore a wrist immobilizer, except when bathing.  (R. 375).  She needed some assistance with activities of daily living, she had difficulty with fine motor activities, and she required physical therapy three times per week for at least 12 weeks to increase her range of motion and overall function of the wrist and to decrease pain and edema. (R. 376).

On November 28, 2016, Plaintiff saw Monica Kwicklis, M.D. for increased anxiety following her wrist fracture.  (R. 577–78).  On examination, Plaintiff's mood was dysthymic and anxious; her affect was abnormal and showed worry.  (R. 578).  On January 25, 2017, Plaintiff followed up with her surgeon Dr. Abcock.  (R. 495–98).  She continued to experience pain over the posterior aspect of the wrist.  (R. 496).  It was noted that she had limited range of motion in

the wrist, numbness in the fingers intermittently, and she wore her brace more often due to wrist pain and spasms in the hand and fingers. (R. 498).

On January 27, 2017, Plaintiff returned to Dr. Kwicklis for anxiety that was "through the roof." (R. 579–80). Again, Plaintiff's mood was dysthymic and anxious, and her affect abnormal. (R. 580). On February 9, 2017, Plaintiff saw pain management specialist Nathaniel Gould, M.D. for right wrist pain. (R. 476–76, 486–89). On exam, Plaintiff had: limited range of motion in her shoulder; elbow range of motion was limited on the right; Tinel's was positive at the right wrist; fingertips on the left were 1.5 degrees warmer than on the right; right hand felt moderately clammy; right wrist supination was moderately reduced, and right wrist extension was severely reduced; right index finger did not fully flex; and grip strength on the right was 4 out of 5 ("4/5"). (R. 488). She was assessed with a 70% temporary impairment. (R. 476). Dr. Gould found that Plaintiff's complaints were consistent with her history of injury/illness, and her history of injury/illness was consistent with objective findings.

On February 23 and March 2 and 9, 2017, Dr. Gould administered an ultrasound guided right stellate ganglion block, which temporally alleviated Plaintiff's pain. (R. 427–35, 458–67, 473–75). On March 20, 2017, Dr. Gould treated Plaintiff for continuing pain. (R. 454–57, 472). On exam, Dr. Gould found that Plaintiff had a reduced range of motion, intermittent color changes, and clamminess in the right hand, and Plaintiff's ability to use her right hand repetitively was limited and strength was moderately reduced. (R. 455).

On March 27, 2017, Dr. Gould treated Plaintiff for pain to the right wrist and forearm along with stiffness in all the fingers on the right. (R. 421–26, 480–85). On exam, strength was 4/5 on the right for grip and elbow flexion/extension. (R. 421). In addition, carpal compression was positive, and testing showed slightly prolonged distal latency in median motor and sensory

testing likely secondary to suboptimal hand temperature.  (R. 421, 480).  On April 6, 2017, Dr. Gould treated Plaintiff for right arm and hand pain up to 9/10.  (R. 451–53, 471).  On exam, her hand felt cold, she had numbness in her right hand and fingers, and her hand showed reduced range of motion, intermittent color changes, clamminess, and mildly increased amount of hair. (R. 451–52).  Dr. Gould found that Plaintiff's ability to use her right hand repetitively was limited and her strength moderately reduced.  (R. 452).  He prescribed Lyrica for pain.  (R. 453).

On May 1, 2017, Dr. Gould and David Campola, FNP treated Plaintiff for right wrist pain ranging from 5/10 to 9/10 occurring 25-50% of the time.  (R. 448–50, 470).  On exam, there was reduced range of motion, intermittent color changes, and clamminess.  (R. 449). Again, Dr. Gould found that Plaintiff's ability to use her right hand repetitively was limited and her strength moderately reduced.  (R. 450).  Dr. Gould assessed that Plaintiff had CRPS.  (R. 450, 470).  On May 19, 2017, Plaintiff returned to Dr. Gould for right wrist pain ranging from 5/10 to 9/10 occurring 25-50% of the time.  (R. 445–47, 469).  On exam, there was reduced range of motion, intermittent color changes, and clamminess.  (R. 447).  Again, Dr. Gould found limited ability to use her right hand repetitively and moderately reduced strength.  (R. 447).

On June 30, 2017, Dr. Gould and FNP Campola treated Plaintiff for right wrist pain ranging from 5/10 to 9/10 occurring 25-50% of the time.  (R. 441–44, 468).  On exam, there was reduced range of motion, intermittent color changes, clamminess, and mildly increased amount of hair suggestive of CRPS.  (R. 442).  Dr. Gould found that CRPS explained her persisting pain more than any other diagnosis.  (R. 443).  Again, Dr. Gould found limited ability to use her right hand repetitively and moderately reduced strength.  (R. 443).  She was assessed with very limited use of her right hand, and she could not perform jobs that required frequent gripping. (R. 468).

On August 10, 2017, Dr. Kwicklis treated Plaintiff for stress and depression.  (R. 589–90, 895–97, 958–59).  On August 30, 2017, FNP Campola and Michael McNulty, M.D. treated Plaintiff for right wrist pain, weakness, swelling, color changes, temperature changes, and sensitivity to touch.  (R. 437–40, 467).  On exam, range of motion of the wrist for flexion and extension was reduced by approximately 50%.  (R. 438).  Again, Plaintiff had limited ability to use her right hand repetitively and moderately reduced strength.  (R. 439).  She was assessed with very limited use of her right hand, and she could not perform jobs that require frequent gripping of anything.  (R. 467).

On September 13 and 27, 2017, Dr. Gould and FNP Campola treated Plaintiff for right wrist pain occurring 25-50% of the time.  (R. 789–95, 835–41, 855–56).  Her symptoms were aggravated by use of the right arm or hand.  (R. 789, 782).  On exam, they found: ulnar deviation of the wrist; range of motion of the right wrist was decreased globally with the greatest reduction noted in supination, radial deviation, and flexion; the right hand was whiter than the left hand; the right palm was more sweaty than the left palm; the right hand was colder than the left hand; and the right hand had less hair on it than the left hand.  (R. 783, 790–93).  Plaintiff could not lift items with her right hand, and her ability to use her right hand was severely limited.  (R. 790, 793).  She was noted to meet the criteria for CRPS on September 13, 2017. (R. 794, 795).  She was limited to lifting 1 pound occasionally with the right hand.  (R. 855).

On October 2, 2017, Plaintiff returned to Dr. Kwicklis and reported being very anxious and unable to work.  (R. 897–98, 960–61).  Plaintiff also sought treatment for anxiety and depression from psychologist Toby Davis, Ph.D., who saw her over a dozen times in late 2017 and 2018.  (R. 745–48, 938).  On exam, Plaintiff generally exhibited psychomotor slowing, dysthymic mood, anxiety, hopelessness, and helplessness.  (R. 745–46).  On November 8 and

December 7 and 21, 2017 and January 5 and 25, February 7 and 26, March 12, April 12, and May 14, 2018, Dr. Kwicklis treated Plaintiff for anxiety and depression.  (R. 899–921).  Plaintiff was generally dysthymic, depressed, anxious, irritable, unhappy, and frustrated.  (R. 900–918).  She completed patient health questionnaires, which confirmed her depression.  (R. 904, 912, 918, 962–72).

On December 22, 2017 and January 26, February 2 and 9, and April 4, 2018, Dr. Gould and FNP Campola treated Plaintiff for right wrist pain occurring 75-100% of the time.  (R. 769–88, 815–34, 850–54).  Her symptoms were aggravated by use of the right arm or hand.  (R. 769, 773, 777, 781, 785).  Exams generally showed: right hand colder than left, decreased range of motion of the right wrist, color asymmetry with bluish hue of the right hand, and hair growth asymmetry.  (R. 778, 781).  The Budapest Clinical Diagnostic Criteria for CRPS was applied and met on December 22, 2017 and April 4, 2018.  (R. 770–71, 786-87).  X-rays, laboratory results, an MRI, and an EMG/NCV were reviewed.  (R. 771, 774, 778, 782, 787).  Dr. Gould found that Plaintiff's ability to use her right hand was severely limited, and she was limited to lifting 1 pound occasionally with the right hand.  (R. 771, 775, 778, 782, 787, 850–54).

On April 18, 2018, Clifford B. Soults, M.D. of Crouse Medical Practice Neurosurgery treated Plaintiff for right hand pain.  (R. 650–52).  The exam showed: strength limited to 4/5 for right intrinsic muscles and right grip; wrist extension and flexion were decreased; and mild hypothenar eminence atrophy, moderate coolness, and mild discoloration of the right hand.  (R. 651–52).  Dr. Soults assessed that Plaintiff had CRPS of the right upper extremity and found her to be 100% temporarily impaired.  (R. 652).

On May 11, June 12 and 28, and July 31, 2018, Dr. Gould and FNP Campola treated Plaintiff for right wrist pain occurring 75-100% of the time.  (R. 758–68, 804–14, 846–49).  Her

ability to use her right hand was severely limited.  (R. 760, 764, 768).  Her CRPS was confirmed under the Budapest Clinical Diagnostic Criteria on December 22, 2017 and April 4, 2018.  (R. 760, 764, 770–71, 786–87).  She was limited to lifting 1 pound occasionally with the right hand.  (R. 846–47, 849).  On June 12, 2018, Dr. Gould implanted in Plaintiff's back a spinal cord stimulator lead and neurostimulator electrode for a cervical spinal cord stimulator trial.  (R. 860–63).  On June 18, 2018, Dr. Gould performed spinal cord stimulator reprogramming with fluoroscopy and lead removal.  (R. 858–59).  Plaintiff reported 50-75% pain relief while using the spinal cord stimulator, with improved use of hand and range of motion.  (R. 858).

On June 19, 2018, Plaintiff returned to Dr. Soults for CRPS.  (R. 646–47).  She underwent a trial of a dorsal column stimulator in the cervical region which provided 50-75% relief.  (R. 646).  On exam, Plaintiff's strength was limited to 4/5 for right intrinsic muscles and right wrist extensors and flexors.  (R. 646).  An MRI of her cervical spine from May 7, 2018 showed loss of cervical lordosis and a broad-based C6-7 bulge.  (R. 646, 648–49, 864–85).  She was assessed as 100% temporarily impaired.  (R. 647).  On July 20, August 23, September 24, October 24, and November 19, 2018, Dr. Kwicklis treated Plaintiff for depression and anxiety.  (R. 923–35).  Plaintiff generally exhibited a dysthymic, depressed, and anxious mood, with abnormal and somber affect.  (R. 924).

On September 28, 2018, Dr. Gould and FNP Campola treated Plaintiff for right wrist pain occurring 75-100% of the time.  (R. 754–57, 800–03, 845).  Physical findings confirmed the criteria for CRPS.  (R. 755–56).  Dr. Gould recommended permanent placement of the spinal cord stimulator, but WC had not approved Plaintiff for the procedure.  (R. 756).  On January 30, 2019, Dr. Kwicklis treated Plaintiff for anxiety, depression, nausea, and vomiting.  (R. 868–71).  On January 31, 2019, Dr. Gould and FNP Campola treated her for right wrist pain occurring 75-

100% of the time.  (R. 750–53, 796–99, 844).  On exam, Plaintiff had reduced range of motion of the right wrist, reduced grip strength of the right hand, and limited grasp of the right hand. (R. 751–52).  Dr. Gould's assessment remained the same.  (R. 752).

### 2. Medical Opinions

On January 9, 2017, Plaintiff underwent a Functional Capacity Evaluation in connection with her WC claim, which found that she could sit for 15 minutes, stand for 15 minutes, and intermittently sit, stand, and walk for 95 minutes.  (R. 271–75, 534–43).  Her right-hand strength was significantly decreased.  (R. 272).  On January 18, 2017, independent medical examiner Kevin Scott, M.D. examined Plaintiff: Dr. Scott assessed that "she can do a sit-down job where she does not use the right hand and no lifting greater than 5-pounds," and "[s]he needs to wear her brace during that time."  (R. 973–77).  On April 21, 2017, independent medical examiner Steven C. Weinstein, M.D. concluded that Plaintiff was not a candidate for a spinal cord stimulator trial.  (R. 979–83).  On August 1, 2017, independent medical examiner Christopher Grammar, M.D. examined Plaintiff and concluded that she did not have CRPS.  (R. 990–95).

On September 13, 2017, Plaintiff's treating physician Dr. Gould completed a permanency assessment for her WC claim, finding that: she had severe CRPS of the right hand, she could perform simple grasping and fine manipulation occasionally, and she was only capable of sedentary work.  (R. 856).  On October 11, 2017, State agency consultant Kautilya Puri, M.D. completed an internal medicine examination, finding that Plaintiff had "mild limitations to fine motor movements with her right hand," "mild limitations to gross motor movements with mild limitations to her grip and to her activities of daily living," and "mild limitations to lifting weights."  (R. 632–35).

On October 11, 2017, State agency consultant Sara Long, Ph.D. completed a psychiatric evaluation and found that Plaintiff had no mental limitations. (R. 646–39). On October 20, 2017, non-examining State agency consultant J. Koenig, M.D. assessed that Plaintiff was able to perform a range of light work. (R. 83–88). Dr. Koenig found Plaintiff "should avoid more than occasional fine and gross manipulation" with her right hand. (R. 640–42). On October 23, 2017, non-examining consultant M. Marks, Ph.D. found that Plaintiff's mental impairment was non-severe. (R. 81, 643–45). On April 10 and July 16, 2018, Dr. Grammar reviewed Plaintiff's updated medical records for WC, and he again disagreed with Dr. Gould's diagnosis of CRPS. (R. 996–1007).

On March 20, 2019, treating psychologist Dr. Davis completed a medical source statement, opining that Plaintiff's anxiety and depression were linked to her wrist injury, and that she would likely be absent from work one day per month as a result of her impairments or treatment. (R. 1008–10). Dr. Davis found that Plaintiff had difficulty thinking or concentrating, mood disturbance, and emotional withdrawal/isolation, but her mental abilities and aptitudes to do unskilled work were largely unlimited or very good. (R. 1008–10).

On March 22, 2019, treating physician Dr. Kwicklis completed a medical source statement for Plaintiff, finding that she was very anxious and could not meet competitive standards in the following areas: remember work-like procedures; carry out very short and simple instructions; maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept

instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precaution.  (R. 1011–13).  Dr. Kwicklis opined that Plaintiff was incapable of even low stress jobs and would likely be absent more than four days per month because of her impairments or treatment.  (R. 1013).

On March 22, 2019, Dr. Gould completed a medical source statement for Plaintiff.  (R. 1014–16).  Treatment was noted every 2-3 months for right wrist fracture and CRPS.  (R. 1014). Dr. Gould assessed that Plaintiff could rarely lift and carry less than 10 pounds with the right hand and frequently lift and carry 20 pounds with the left.  (R. 1015).  Rarely was defined as 1% to 5% of an 8-hour working day.  (R. 1015).  She could rarely use the right hand for grasping, turning, or twisting objects and rarely use the right fingers for fine manipulations.  (R. 1015–16). She would likely be absent more than four days per month because of her impairments or treatment.  (R. 1016).  She frequently experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks.  (R. 1016).

### D.  ALJ's Decision Denying Benefits

At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in gainful employment since October 5, 2016, the alleged onset date of disability.  (R. 17).  At step two, the ALJ determined that Plaintiff had the following "severe" impairments: 1) right distal ulnar fracture status post open reduction and internal fixation; 2) anxiety disorder; 3) headaches/migraines; and 4) depressive disorder.  (R. 18).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  (R. 19).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a), with the following additional limitations:

> can never climb ropes, ladders, or scaffolds; can frequently reach, handle, finger, and feel with the right upper dominant extremity; can occasionally tolerate exposure to changes in weather, extreme heat, extreme cold, wetness, humidity, vibration, and atmospheric conditions; can tolerate a moderate noise intensity level as defined in the *Dictionary of Occupational Titles* (DOT) and *Selected Characteristics of Occupations* (SCO); can tolerate occasional exposure to light brighter than that typically found in an indoor work environment, such as an office or retail store; can work at a consistent pace throughout the workday, but not at a production rate pace where each task must be completed within a strict time deadline; and can tolerate a low level of work pressure, defined as work not requiring multitasking, detailed job tasks, significant independent judgment, very short deadlines, teamwork in completing job tasks, more than occasional changes in work setting, or more than occasional contact with the public.

(R. 22).

Next, the ALJ found that Plaintiff was unable to perform any of her past relevant work. (R. 35).  The ALJ then asked a vocational expert whether "jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity."  (R. 37).  The vocational expert responded that such jobs included document preparer, toy stuffer, and table worker.  (R. 37).  Consequently, the ALJ concluded that: "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (R. 37).  In sum, the ALJ concluded that Plaintiff was not disabled. (R. 37).

## III.    DISCUSSION

### A.  Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The Regulations define RFC as "the most you can still do despite your limitations," including limitations on physical and mental abilities.  20 C.F.R. §§ 404.1545, 416.945.  In assessing the RFC of a claimant with

13

multiple impairments, the Commissioner considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'" *Id.* at §§ 404.1545(a)(2), 416.945(a)(2).  The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last.  *Selian*, 708 F.3d at 418.

### B.  Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources.  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).  However, an ALJ is not a medical professional,

and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018).  In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

### C.  Evaluating Medical Opinions

For claims filed after March 27, 2017, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules")*, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).  The ALJ is still required to "articulate how [he] considered the medical opinions" and "how persuasive [he] find[s] all of the medical opinions."  *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion.  *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1).  The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with

the evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§

404.1520c(c)(2), 416.920c(c)(2).  An ALJ must consider, but is not required to discuss, the

three remaining factors when determining the persuasiveness of a medical source's opinion.

*Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).  Because Plaintiff filed her application for benefits

on July 19, 2017, her claim is governed by the new regulations.

### D.  Analysis

Plaintiff now challenges the disability decision on the grounds that: 1) the ALJ's reasons

for discounting the opinions of her treating providers are not supported by the record; and 2) the

RFC formulated by the ALJ is not supported by substantial evidence.  (Dkt. No. 12).  In

response, the Commissioner contends that the ALJ properly weighed the medical opinions and

that substantial evidence supports the RFC.  (Dkt.  No. 15).

#### 1)  Medical Opinions

First, Plaintiff faults the ALJ's analysis with respect to two treating providers: her pain

management specialist Dr. Gould, and her primary care doctor Dr. Kwicklis.  (Dkt. No. 12, p.

17).  The Court will consider each in turn.

##### a)  Dr. Gould

As relevant here, Dr. Gould completed a medical source statement dated March 22,

2019.  (R. 1014–16).  Dr. Gould assessed that Plaintiff could only rarely lift and carry less than

10 pounds with her right hand.  (R. 1015).  She could rarely use the right hand for grasping,

turning, or twisting objects and rarely use the right fingers for fine manipulations.  (R. 1015–16).

She would likely be absent more than four days per month because of her impairments or

treatment.  (R. 1016).  She frequently experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks.  (R. 1016).

According to the ALJ's decision, he accorded "little persuasiveness" to the opinion of Dr. Gould.  (R. 28).  The ALJ explained that the additional exertional and non-exertional limitations found by Dr. Gould were "not well-supported given the scant chronically positive objective clinical findings."  (R. 28).  The ALJ also stated that "some of the opinions amount to a 'check box' form without referral to clinical or diagnostic finding or narrative explanation for the limitations that were provided."  (R. 29).  Further, the ALJ stated that the limitations "appear to be based primarily on the claimant's subjective self-reports of symptoms and functional limitations that are inconsistent with the evidence," including: "the claimant's overall positive response to surgery, her inconsistent statements about the severity of her symptoms, and her engagement in activities consistent with a range of sedentary work."  (R. 29).

Plaintiff argues that "the record overwhelmingly supports Dr. Gould's assessment of debilitating exertional and nonexertional limitations resulting from CRPS as required under SSR 03-2p and the updated regulations."  (Dkt. No. 12, p. 19).  According to Plaintiff, "[e]very treatment note of Dr. Gould contained findings relevant to CRPS . . . and every note indicate[d] that her ability to use the right hand was severely limited."  (*Id.*, p. 20).  In response, the Commissioner contends that Dr. Gould's opinions were not supported by objective clinical findings and were inconsistent with other record evidence.  (Dkt. No. 15, pp. 8–12).

Notably, although the ALJ discounted Dr. Gould's assessment of Plaintiff's limitations related to CRPS, the ALJ did not discuss in any detail the Social Security Ruling regarding that condition.  SSR 03-2p defines CRPS as a "chronic pain syndrome most often resulting from trauma to a single extremity."  *See* Titles II and XVI: Evaluating Cases Involving Reflex

Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome, 68 FR 59971-01 ("SSR 03-2p").  As relevant here, SSR 03-2p states that CRPS can be established "in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant" and one or more of the following clinically documented signs in the affected region: 1) swelling; 2) autonomic instability—seen as changes in skin color or texture, changes in sweating, changes in skin temperature, and abnormal pilomotor erection; 3) abnormal hair or nail growth; 4) osteoporosis; or 5) involuntary movements of the affected region of the initial injury.  The Ruling further states that:

> The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma.
>
> *******
>
> It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual.
>
> *******
>
> Reported pain at the site of the injury may be followed by complaints of muscle pain, joint stiffness, restricted mobility, or abnormal hair and nail growth in the affected region.
>
> *******
>
> It should be noted that conflicting evidence in the medical record is not unusual . . . due to the transitory nature of its objective findings and the complicated diagnostic process involved.

SSR 03-2p.

Here, the ALJ recognized that Plaintiff had been diagnosed with CRPS, but he found that her "reports and presentation lacked many of the characteristic symptoms of CRPS."  (R. 30).  However, Dr. Gould's treatment notes indicate that Plaintiff had persistent pain in the right hand/wrist, accompanied by abnormal hair growth and changes in skin color and temperature—all symptoms of CRPS, the latter of which are also objective clinical findings.  And while the ALJ cited the lack of corroborating X-rays and other diagnostic tests, the Ruling makes clear

18

that conflicting evidence is to be expected with CRPS and that the degree of pain is typically disproportionate to the injury.  Furthermore, given the nature of CRPS, Dr. Gould had to rely in part on Plaintiff's subjective symptoms of pain in making his assessment.  Dr. Gould's assessment is also supported by his findings that Plaintiff had limited range of motion and grip strength in the right hand, and it is largely consistent with Dr. Soults's assessment that she had CRPS of the right upper extremity and reduced range of motion, as well as Dr. Koenig's finding that Plaintiff should avoid more than occasional fine and gross manipulation with the right hand.  Overall, the ALJ's decision shows that the reasons given for discounting Dr. Gould's assessment do not stand up to close scrutiny, particularly in light of SSR 03-2p, Dr. Gould's extensive history treating Plaintiff, and his specialization in pain management.

### b) Dr. Kwicklis

On March 22, 2019, Dr. Kwicklis also completed a medical source statement.  (R. 1011–13).  Dr. Kwicklis found that Plaintiff was very anxious and could not meet competitive standards in numerous areas including: make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress.  (R. 1011–13).  Dr. Kwicklis opined that Plaintiff was incapable of even low stress jobs and would likely be absent more than four days per month because of her impairments or treatment.  (R. 1013).

The ALJ also accorded "little persuasiveness" to the opinion of Dr. Kwicklis.  (R. 33). The ALJ found that this opinion was "not well-supported given the scant chronically positive objective clinical findings."  (R. 33).  The ALJ also stated that the opinion "amounts to a 'check box' form without referral to clinical or diagnostic finding or narrative explanation for the

limitations that were provided." (R. 33). And the ALJ stated that the limitations "appear to be based primarily on the claimant's subjective self-reports of symptoms and functional limitations that are inconsistent with the evidence," including: "the claimant's overall positive response to mental health treatment, her inconsistent statements about the severity of her symptoms, and her engagement in activities consistent with a range of unskilled work." (R. 33).

Plaintiff argues that "Dr. Kwicklis identified clinical or diagnostic findings and a narrative explanation for the limitations that were provided in her own treatment notes that are consistent with her opinion." (Dkt. No. 12, p. 20). According to Plaintiff, these treatment notes contradict the ALJ's findings that Plaintiff had an "overall positive response to mental health treatment" and "few chronically positive clinical findings on repeat mental status exams." (*Id.*, p. 21). In response, the Commissioner contends that Dr. Kwicklis's opinion was not supported by substantial evidence. (Dkt. No. 15, p. 14). The Commissioner points to evidence that Plaintiff's mental status exams generally showed normal functioning and no impairment. (*Id.*, p. 15). And the Commissioner argues that the ALJ properly relied on the less restrictive opinions given by Dr. Long and Dr. Davis. (*Id.*, p. 18).

Upon review of the record, the Court finds that the mental portion of the RFC formulated by the ALJ is supported by substantial evidence, which also supports the ALJ's assessment of Dr. Kwicklis's opinion. There is no dispute that Plaintiff suffers from anxiety and depression. However, Dr. Kwicklis's restrictive assessment is inconsistent with her treatment notes, which generally showed that Plaintiff's cognitive functioning was normal, and her thought process was unimpaired. (*See, e.g.*, R. 900, 902). The notes also showed that Plaintiff was taking medication for depression and anxiety and seeing a counselor. And that counselor, Dr. Davis, found that Plaintiff's mental abilities and aptitudes to do unskilled work were largely unlimited

or very good.  (R. 1008–10).  The ALJ accorded this opinion some persuasiveness and did the same for the opinion of Dr. Long, who examined Plaintiff and found that she did not have any mental limitations and could function on a regular basis.  (R. 638).  Thus, the ALJ gave sound reasons for discounting Dr. Kwicklis's opinion based on shortcomings in supportability and consistency with the record.  Moreover, the ALJ accounted for some reduced mental functioning in the RFC by restricting Plaintiff to jobs with "a low level of work pressure, defined as work not requiring multitasking, detailed job tasks, significant independent judgment, very short deadlines, teamwork in completing job tasks, more than occasional changes in work setting, or more than occasional contact with the public."  (R. 22).

### 2) RFC Determination

Finally, Plaintiff argues that the ALJ failed to cite substantial evidence to support the RFC finding that she "can frequently reach, handle, finger, and feel with the right upper dominant extremity."  (Dkt. No. 12, p. 23).  In response, the Commissioner argues that this part of the RFC is supported by the opinions of Dr. Puri and Dr. Koenig, as well as other evidence in the record.  (Dkt. No. 15, p. 25).

As discussed above, the ALJ's assessment of Dr. Gould's opinion is not supported by substantial evidence.  And the ALJ's decision to give little persuasiveness to this opinion naturally affected the RFC with respect to Plaintiff's abilities and limitations for her right hand.[1] Indeed, the ALJ assessed no limitations whatsoever in this regard.  But as Plaintiff points out, the ALJ does not cite any specific opinion evidence supporting this finding.  To the contrary, several other physicians found that Plaintiff *did* have limitations with the right hand.  Dr. Scott

---

[1] *See Brenda U. v. Saul*, No. 18 Civ. 918, 2019 WL 4689605, at *3, 2019 U.S. Dist. LEXIS 170903, *9 (N.D.N.Y. Sept. 25, 2019) (recognizing that the weight given to the treating physician's opinion would "have a significant impact on any further RFC finding").

assessed that "she can do a sit-down job where she does not use the right hand and no lifting greater than 5-pounds," and "[s]he needs to wear her brace during that time." (R. 973–77). Dr. Koenig found that Plaintiff "should avoid more than occasional fine and gross manipulation" with the right hand. (R. 640–42). Dr. McNulty and FNP Campola found that Plaintiff had limited ability to use her right hand repetitively and moderately reduced strength. (R. 439). And Dr. Soults assessed that she was 100% temporarily impaired based on CRPS in the right hand. (R. 652).

The ALJ mostly disregarded these opinions and instead assessed Plaintiff's ability to use her right hand based on a few grip tests and her activities of daily living, "such as taking care of her own grooming, cooking, cleaning, doing laundry, and shopping." (R. 26, 33). However, it is not clear if these activities, which may cause Plaintiff considerable pain, mean that she could work-full time using her right hand. Notably, there is no specific discussion of how CRPS would impact Plaintiff's RFC. In any event, the ALJ was not entitled to substitute his own lay opinion for that of the medical professionals on the issue of Plaintiff's use of her right hand. Accordingly, the ALJ's finding that Plaintiff "can frequently reach, handle, finger, and feel with the right upper dominant extremity" is not supported by substantial evidence. *See Michael T. v. Commr. of Soc. Sec.*, No. 19 Civ. 956, 2021 WL 681287, at *10, 2021 U.S. Dist. LEXIS 32641, at *25 (W.D.N.Y. Feb. 22, 2021) ("It is well settled that an ALJ cannot arbitrarily substitute his own lay opinion for competent medical opinion evidence.") (citation omitted); *Patrick M. v. Saul*, No. 18 Civ. 290, 2019 WL 4071780, at *10, 2019 U.S. Dist. LEXIS 146948, at *28 (N.D.N.Y. Aug. 28, 2019). ("The Plaintiff's ability to attend medical appointments and engage in other daily activities of limited duration do[es] not correlate to the Plaintiff's ability to stay

on-task during an eight-hour work day or the likelihood that he would miss work several days per month because of exacerbations of his chronic back or neck pain.").

## IV.    CONCLUSION

In sum, the ALJ's decision is not supported by substantial evidence, for the reasons explained above.  The Court finds that remand is appropriate in this case for the ALJ to reassess Dr. Gould's opinion and then do the same for Plaintiff's RFC—focused on the issue of her abilities and limitations with the right hand, based on all the medical evidence.  *See also Sandra C. v. Saul*, No. 19 Civ. 942, 2021 WL 1170285, at *6, 2021 U.S. Dist. LEXIS 59313, at *17 (D. Conn. Mar. 29, 2021) (remanding disability claim where the ALJ's decision did not contain a "meaningful discussion of plaintiff's CRPS and SSR 03-02p," and the RFC did not consider the effect of CRPS symptoms).

For the foregoing reasons it is

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties in accord with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date: May 10, 2021
       Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge